## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                                    Case No. 16-30173-WRS
                                                         Chapter 7

FREDDIE LEWIS STRENGTH,

      Debtor

USAMERIBANK,

      Plaintiff                                     Adv. Pro. No. 16-3022-WRS

  v.

FREDDIE LEWIS STRENGTH,

      Defendant

## MEMORANDUM DECISION

This Adversary Proceeding came before the Court for an evidentiary hearing on

September 27, 2016, on Plaintiff USAmeriBank's ("Bank") Motion to Alter and Amend. (Doc.

25). For the reasons set forth below, the motion is DENIED.

## I.  FACTS

### A.  Procedural History

On January 22, 2016, Freddie Lewis Strength filed a petition in bankruptcy pursuant to

Chapter 7 of the Bankruptcy Code.    On March 22, 2016, the Bank filed a timely complaint

seeking a determination that its indebtedness is excepted from the Debtor's discharge. (Doc. 1).

When the Debtor failed to answer the complaint, the Bank moved for default judgment. (Doc.

9). The Court set an evidentiary hearing for May 9, 2016. (Doc. 13). After hearing evidence,

the Court found that the Bank's reliance on financial statements provided by Strength was not

reasonable and, as a result, the debt is not excepted from discharge—i.e. the debt did discharge. (Docs. 17–18).  On August 17, 2016, the Bank filed a timely motion to alter and amend.  (Doc. 25).  The matter was heard on September 27, 2016, where the Bank offered additional evidence, which has been considered by the Court.

## B.  The Financial Statements

### 1.  General Considerations

The Bank offered financial statements executed by Strength, dated May 21, 2008, and May 22, 2009, respectively into evidence.  (Plaintiff's Exhibits B and C).  Strength is indebted to the Bank in the approximate amount of $23,000, pursuant to a Promissory Note dated September 16, 2009. (Plaintiff's Exhibit A).   The Bank claims that it relied on the financial statements when it made the loan to Strength.

The financial statements are materially false.  Strength represented  that he owned real estate worth $1,000,000.  He does not.  Moreover, the Court infers from Strength's failure to answer or participate in this proceeding, that he knew the representation was false at the time he made it and that he intended to mislead the Bank.  The only fact which merits further consideration is whether the Bank's reliance on the financial statement was reasonable.

### 2.  The financial statements, on their face, appear irregular, which should have prompted the Bank to inquire further

The financial statements in question report that Strength owns real estate valued at $1,000,000.  The Bank contends that it relied upon this representation when it made its loan to Strength.  The Court identifies five indicators or "red flags" which show that the financial

-2-

statements were anomalous and should have merited additional inquiry by the Bank before it loaned Strength any money. First, the amount of $1,000,000 stands out—dramatically—from the rest of the information on the financial statements. Not to put too fine a point on this, $1,000,000 is a great deal of money. Second, real estate holdings of $1,000,000 are grossly incongruent with Strength's level of income, which the Bank knew to be in the $20,000 to $30,000 range annually. Third, the real estate was not subject to a mortgage—highly unusual in a case such as this. Fourth, the financial statement calls for detail on real estate, yet none was provided. Fifth, $1,000,000 is a suspiciously round figure.

### a. $1,000,000 in real state stands out—dramatically

In his most recent financial statement, Strength reports owning cash in the amount of $2,898.77, an automobile worth $14,500, a life insurance policy with a cash value of $24,000, real estate worth $1,000,000, and nothing else. <u>See</u>, Exhibit C. More than 98% of Strength's assets, according to his financial statement, consist of real estate. That alone should have merited further inquire.

### b. $1,000,000 in real estate is incongruous with $30,000 in annual income

Second, ownership of a $1,000,000 in real estate is incongruous with an annual income level in the $20,000 to $30,000 range. It goes without saying that individuals who earn income in that range usually do not own $1,000,000 in real estate. When one with such a modest income claims ownership of $1,000,000 worth of real estate, questions should necessarily be raised.

-3-

To rebut the Court's finding on this point, the Bank submitted an affidavit of J.D. May stating that Strength had an annual income of $313,860. (Doc. 25, Ex. 1). May cites the income reported on the financial statement and multiplies by twelve to arrive at that figure. To be sure, in the abstract, one might argue that the financial statements are ambiguous and that the income figures may be monthly and not annual. However, Cynthia Joiner, a Vice President of the Bank, testified at the July 25, 2016, evidentiary hearing that it considered Strength's income tax returns.[1] (Doc. 20, p. 9). Thus, the Bank knew that Strength's income was in the $30,000 range. The Bank's argument—that Strength had income of more than $300,000 making real estate holdings of $1,000,000 plausible—is without merit.

### c. Individuals who earn $30,000 annually do not generally own $1,000,000 worth of real estate free and clear

The Court has considerable experience with individuals who earn income in the range of that earned by Strength. They generally do not own real estate worth $1,000,000, and if they did, it certainly would not be free and clear. A claim that Strength owned $1,000,000 worth of real estate is a red flag, that it is free and clear is doubly so. The Bank's argument, that they did not consider this to be unusual and deserving of further inquiry, is fatuous.

### d. That details concerning the property were not provided, notwithstanding the fact that the Bank's form called for it, is yet another red flag that the Bank overlooked

The financial statement in question has a section on the first page titled "ASSETS." One of the line items under Assets is "Real Estate – See Schedule C (on 2nd page)." In the box

---

[1] The Bank did not submit copies of the tax returns into evidence.

following that line, the amount of $1,000,000 is entered.  If one turns to page 2 of the financial statement, one will find a Schedule C that calls for the following information: "Description of Property and Improvements, Cost, Market Value, Mortgages Payable," with sub categories calling for "Balance, Payment, Paid To, Acquired, Maturity."  None of this information was provided in Strength's financial statement.  All of that blank space, given Strength's claim that he owned real estate valued at $1,000,000, was an unmistakable red flag.

The Bank argues that the detail called for on Schedule C was not required.  (Doc. 25, p. 6).  Such an argument is disingenuous.  It was not required because the Bank did not require it.  The point here is that Strength's failure to provide the called for detail—that is detail called for by the form itself—is a red flag.  The Bank should have inquired; had they done so, Strength's fraud would certainly have been discovered.  The Bank's argument that all of the blank space on Schedule C, which calls for detail on real estate owned, was not indicative of underlying problems is without merit.

### e. $1,000,000, is such a large and round number as to be a cliche

The phantom real property was supposedly worth $1,000,000, a suspiciously large and round number.  To be sure, standing alone, it may not be much, but when coupled with all of the facts discussed above, this is yet another indication that the matter should have been inquired into.

### C. The Bank did not conduct any due diligence
### in light of facially deficient financial statements,
### hence their reliance on them was not reasonable

The Court has identified five indicators or "red flags" in the financial statements, which should have prompted the Bank to make further inquiry. The Court is aware that the Bank disputes this conclusion and has asked the Court to reconsider. Having carefully examined the financial statements and other evidence and having carefully considered the testimony of Cynthia Joiner and J.D. May, the Court rejects the assertion that the financial statements, on their face, did not merit further inquiry. While both Joiner and May have training and experience in reading financial statements, they are both biased witnesses. The Court also has experience in reading financial statements.

The Court notes what is not in question here. Had the Bank admitted that the financial statements raised red flags and taken some action that was not sufficient to detect the fraud, we would have a very difference case. This is, the Court here need not consider how much due diligence should have been done, only that some action should have been taken. If nothing more, the Bank should have asked Strength where the property was located, what it was, and they could have asked for documentation showing how he acquired the property. The cost would have been minimal and, in this case, Strength would not have been able to satisfactorily answer.

The Bank argues that this was a $27,000 loan, which does not merit much due diligence. The Bank's point is well taken—the larger the loan the greater the Bank's obligation to conduct due diligence. However, the Bank's argument, that it did not have to do anything because it was only a $27,000 loan and because Strength had not defaulted in the past, is not well taken.

-6-

Cynthia Joiner testified and the Bank admits in its Motion to Alter and Amend, that it is not their policy to follow up on financial statements where the borrower has not defaulted in the past. If the Court were to observe the Bank's policy, the requirement of "reasonable reliance" under § 523(a)(2)(B) would become meaningless in almost all cases. The Bank's policy is a poor one. It is one that the Court need not and will not follow.

## II. LAW

### A. Jurisdiction

This Court has jurisdiction to hear this proceeding pursuant to 28 U.S.C. § 1334(b). This is a core proceeding. 28 U.S.C. § 157(b)(2)(I). This is a final order.

### B. Motions to Alter and Amend

Motions to Alter and Amend are governed by Rule 9023, Fed. R. Bankr. P., which adopts Rule 59, Fed. R. Civ. P. Such motions may be granted when the moving party shows:

1. An intervening change in the law.

2. Newly discovered evidence, or

3. To correct clear error or prevent manifest injustice.

Jacobs v. Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1344 (11ᵗʰ Cir. 2010); In re Muhammad, 536 B.R. 469, 477 (Bankr. M.D. Ala.). As the Bank has not shown that there has been an intervening change in the law or newly discovered evidence, to prevail on its motion it must prove either clear error or a manifest injustice.

-7-

### C. False Financial Statements § 523(a)(2)(B)

Debts in existence at the time a debtor files bankruptcy, are discharged unless the creditor can point out an exception to discharge. 11 U.S.C. § 727(b). "[E]xceptions to the general rule of discharge . . . are to be strictly construed in favor of the debtor." United States v. Mitchell (In re Mitchell), 633 F.3d 1319, 1327 (11th Cir. 2011); United States v. Fretz (In re Fretz), 244 F.3d 1323, 1327 (11th Cir. 2001).

The Bank alleges two exceptions to discharge in its complaint, under 11 U.S.C. § 523(a)(2)(A) and (B). The Bank has abandoned its claim under § 523(a)(2)(A), and is now proceeding solely under § 523(a)(2)(B), which excepts from discharge

> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by–
>
> * * *
>
> (B) use of a statement in writing–
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money,
> property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive.

It should be noted that the four conditions of § 523(a)(2)(B) are conjunctive, meaning that all four must be shown for the exception to discharge to apply. The only element in dispute is (iii), which provides "on which the creditor to whom the debtor is liable for such money, property services, or credit reasonably relied." Stated simply, the only issue here is whether the Bank can show that its reliance on the financial statements was reasonable.

> This standard of reasonableness places a measure of responsibility
> upon a creditor to ensure that there exists some basis for relying

-8-

upon the debtor's representations. Of course, the reasonableness of
a creditor's reliance will be evaluated according to the particular
facts and circumstances present in a given case.

City Bank & Trust Co., v. Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995) (citing First Bank

v. Mullet (In re Mullet), 817 F2d 677, 679 (10th Cir. 1987)).  "Reasonable reliance connotes the

use of the standard of ordinary and average person" Hurston v. Anzo (In re Anzo), 547 B.R. 454,

467 (Bankr. N.D. Ga. 2016).  "The existence of a 'red flag' which would put a reasonable

prudent person on notice that the information contained in the financial statement may not be

accurate is a key factor in the reasonable reliance test."  Id. at 468.  "A creditor cannot ignore red

flags that suggest inaccuracies, and should undertake at least some minimal investigation as to

the representations contained in a financial statement with red flags."  Id.


## III. ANALYSIS

The Court will divide its analysis of the Bank's claims of error into three parts.  In Part A,

the Court will discuss the Court's discretion to deny a motion for default judgment,

notwithstanding the fact that the Defendant has not answered.  In Part B, the Court will consider

whether the denial of the Bank's motion is a proper exercise of that discretion.  In Part C, the

Court will dispose of the Bank's due process claim.

## A. The Bankruptcy Court May, in Its Discretion, Deny a Motion for Default Judgment Notwithstanding the Defendant's Failure to Answer or Appear in Court

The Bank has raised what it terms nine "allegations of error" in its Motion to Alter and Amend. (Doc. 25, pp. 3–12). The majority of these claims may be disposed by establishing the proposition that this Court, like any trial court in the Federal system, has discretion to deny a motion for default judgment, even if the defendant does not respond. This proposition is well established by binding case law handed down by the United States Court of Appeals for the Eleventh Circuit and persuasive case law handed down by the United States District Court for the Middle District of Alabama.

A motion for default judgment is a creature of Rule 55 of the Federal Rules of Civil Procedure. Rule 55, as made applicable by Rule 7055 of the Federal Rules of Bankruptcy Procedure, provides that a plaintiff *may* attain a default judgment if the defendant fails to plead or defend an action brought against him. Rule 55 lays out the process for attaining a default judgment. Rule 55(a) provides that the clerk of the court *shall* enter a party's default if the party fails to plead or defend the action. Rule 55(b)(2) provides that, unless the amount sought is sum certain, the party must apply to the court for default judgment. At that point, the court *may*, in its discretion, conduct hearings, make referrals, or enter a default judgment. The court's refusal to enter a default judgment is reviewed under an abuse of discretion standard. Wahl v. McIver, 773 F.2d 1169, 1174 (11th Cir. 1985).

An entry of default does not give rise to an absolute right of judgment by default, and a default judgment is in fact judicially disfavored. See Manson v. Lister, 562 F.2d 343, 345 (5th Cir. 1977).

-10-

> It is well-established that "a defendant's default does not in itself warrant the court entering a default judgment." <u>DIRECTV, Inc. v. Huynh</u>, 318 F.Supp.2d 1122, 1127 (M.D. Ala. 2004) (Thompson, J.) (quoting <u>Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank</u>, 515 F.2d 1200, 1206 (5th Cir. 1975).
>
> "There must be a sufficient basis in the pleadings for the judgment entered . . . . The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. In short, . . . a default is not treated as an absolute confession of the defendant of his liability and of the plaintiff's right to recover." <u>Id</u>.
>
> Accordingly, in ruling on the motion for default judgment the court must examine in further detail the defendant's liability under the causes of action alleged in the Complaint. Nonetheless, "whether to grant a motion for default judgment is within the trial court's discretion." <u>Huynh</u>, 318 F.Supp.2d at 1127 (citing <u>Adolph Coore Co. v. Movement Against Racism and the Klan</u>, 777 F.2d 1538, 1542 (11th Cir. 1985).

<u>DIRECTV, Inc. v. Trawick</u>, 359 F. Supp.2d 1204, 1206 (M.D. Ala. 2005); <u>see also</u> <u>Fortson v. Best Rate Funding Corp.</u>, 602 Fed. Appx. 479, 481 (11th Cir. 2015).

In <u>Anheuser-Busch, Inc. v. Philpot</u>, 317 F.3d 1264, 1266 (11th Cir. 2003), the District Court scheduled an evidentiary hearing on the Plaintiff's motion for default judgment. After hearing evidence, the Court found that the Plaintiff had suffered no damages and dismissed its claim, notwithstanding the fact that the Defendant had not appeared. The Eleventh Circuit ruled that the District Court had not abused its discretion in either scheduling a hearing or ruling in favor of the absent Defendant. In <u>Checkcare Systems v. Alexander (In re Alexander)</u>, 212 B.R. 993 (Bankr. M.D. Ala. 1997) (Gordon, B.J.), this Court denied a motion for default judgment,

-11-

finding that the evidence did not support Checkcare's claim that its indebtedness should be excepted from discharge, notwithstanding the fact that the Debtor failed to appear at the hearing.

The Bank cites <u>Surtain v. Hamlin Terrace Foundation</u>, 789 F.3d 1239, 1246 (11th Cir. 2016), in support of its motion. Careful analysis of that case demonstrates that it does not support the Bank here. To begin, the Eleventh Circuit stated that "we review the denial of a motion for default judgment for abuse of discretion." <u>Id.</u> at 1244. <u>Surtain</u> stands for the proposition that the trial court has discretion in its determination whether a motion for default judgment should be granted. The Bank argues that "the correct inquiry in the context of a motion for default judgment is whether the plaintiff has alleged sufficient facts to state a plausible claim for relief." (Doc. 25, p. 3) (citing <u>Surtain</u>). The Bank fails to note the procedural difference between <u>Surtain</u> and the case at bar.

In <u>Surtain</u>, the District Court ruled against the Plaintiff based upon its reading of the complaint. Unlike the case at bar, no evidentiary hearing was held. The posture of the case in <u>Surtain</u> was that of one where the Court was ruling solely on the sufficiency of the complaint, as if it were a Rule 12(b)(6) motion, and not after an evidentiary hearing. If the Bank's argument is correct, a trial court could never look behind the pleadings to the underlying facts of the case. Moreover, the Bank's argument does violence to Rule 55(b)(2)(C), which permits the Court to "establish the truth of any allegation by evidence." For these reasons, the Bank's reliance on <u>Surtain</u> is misplaced. To put the matter differently, the Court's discretion is not merely as to examining the sufficiency of the complaint, but also to examining the truth of any allegation by evidence.

-12-

The Bank cites the case of <u>Lorenzo v. Wells Fargo Bank, N.A. (In re Lorenzo)</u>, 606 Fed. Appx. 548, 553 (11th Cir. 2015), in support of its argument. In <u>Lorenzo</u>, the Bankruptcy Court entered judgment by default in favor of the Bank and later denied a debtor's motion to vacate the default. Again, the Eleventh Circuit cited the applicable standard. "We review the entry of default judgment only for an abuse of discretion." <u>Id</u>. at 552. Again, the standard is the same, the facts are different, which results in a different outcome.

The Bank argues that it should prevail because there was no showing of "good cause" to vacate the entry of default. (Doc. 25, p. 4–5). The entry of default, which was entered by the Clerk here upon a showing by the Bank that the Defendant did not file an answer. (Docs. 9, 11). The entry of default need not and was not vacated here. Rather, the denial of the Bank's motion for default judgment was based upon the Court's sound exercise of its discretion and not upon anything the Defendant did or did not do.

### B. It is a Proper Exercise of the Bankruptcy Court's Discretion to Deny a Motion for Default Judgment When the Bank's Reliance is Not Reasonable

Prior to entering a default judgment, "[t]he court must ensure that the well-plead allegations contained in the complaint actually 'state a cause of action and there is a substantive, sufficient basis in the pleadings for the particular relief sought.'" <u>Gebhardt v. Oliver (In re Oliver)</u>, No. 11-66197-MHM, 2015 WL 3485483, at *2 (Bankr. N.D. Ga. 2015) (quoting <u>Tyco Fire & Security, LLC v. Alcocer</u>, 218 Fed. Appx. 860, 863 (11th Cir. 2007)). Rule 55 of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Rule 7055 of the

-13-

Federal Rules of Bankruptcy Procedure, places this determination in the sole discretion of the judge.

Here, the Bank filed a complaint alleging that a loan extended to Strength was exempt from discharge under 11 U.S.C. § 523(a)(2)(A) and (B). A default was entered against Strength and the Bank moved for a default judgment. Before ruling on the motion, the Court held an evidentiary hearing to determine if there was a sufficient basis for the relief sought as the pleadings failed to give more than a mere recitation of statutory language. Only the applicability of § 523(a)(2)(B) merits discussion, specifically, the "reasonable reliance" requirement. If this element is not sufficiently pleaded or the court finds that the evidence does not suggest reasonable reliance, then Rule 55 grants this Court discretion to deny the motion for default judgment. Huynh, 318 F.Supp.2d at 1127; see Rule 55, Fed. R. Civ. P.

A creditor cannot be said to have reasonably relied, pursuant to § 523(a)(2)(B), on a financial statement with indicators or "red flags" that would prompt a reasonable person to further inquire into the accuracy of the information. Creditors cannot merely rely on the debtor's personal integrity, the reasonable creditor needs to "adopt a more circumspect and prudent approach to lending," which requires some level of minimal inquiry. Midwest Bank & Trust Co., v. Baratta (In re Baratta), 272 B.R. 501, 506–07 (Bankr. M.D. Fla. 2001); O'Donnell v. Floyd (In re Floyd), 177 B.R. 985, 990 (Bankr. M.D. Fla. 1995). Reliance, if you can call it that, on a substantially incomplete financial statement is unreasonable without some level of verification. North Alabama Bank v. Brooks (In re Brooks), 457 B.R. 840, 843–45 (Bankr. N.D. Ala. 2011); Karve Family Limited Partnership v. Mowji (In re Mowji), 224 B.R. 221, 226–27 (Bankr. M.D.

-14-

Fla. 1998); Liberty National Bank v. Wing (In re Wing), 96 B.R. 369, 373 (Bankr. M.D. Fla.

1989). Equally important is the proximity in time between the creation of the financial statement

and the creditor's reliance on that information.  Agribank FCB v. Gordon (In re Gordon), 277

B.R. 805, 811 (Bankr. M.D. Ga. 2001); Enterprise National Bank of Atlanta v. Jones (In re

Jones), 197 B.R. 949, 962 (Bankr. M.D. Ga. 1996); First American Bank of Indian River County

v. Schraw (In re Schraw), 136 B.R. 301, 303 (Bankr. S.D. Fla. 1992); First Sanlando Bank v.

Benore (In re Benore), 108 B.R. 797, 799 (Bankr. M.D. Fla. 1989). Even if all other factors merit

a finding a reasonableness, such a finding may be precluded merely because a creditor relied on

stale financial information. Gordon, 277 B.R. at 811.

     Assessing the reasonableness of the Bank's reliance on Strength's financial statements is

best done by looking to other factually similar cases for guidance. Discussions of the reasonable

reliance requirement in § 523(a)(2)(B) are not new to courts within the Eleventh Circuit. Some

find that a creditor's reliance is not reasonable because the creditor failed to take appropriate

action to confirm the accuracy of the financial statement. For example, in Midwest Bank & Trust

Co., v. Baratta (In re Baratta), a case factually similar to the case at hand, the debtor took out a

series of eight loans and rented commercial space from his creditor over a period of three years.

272 B.R. 501, 506–07 (Bankr. M.D. Fla. 2001). There were a series of three initial

loans—$67,500, $5,000, and $4,000—while the remaining were mere extensions of these loans.

Id. The relationship from the beginning gave a clear picture that the debtor was in financial

trouble. Id. The creditor conceded that the $5,000 and $4,000 loans were dischargeable; however,

the creditor argued that the promissory note for $67,500 was nondischargeable under 11 U.S.C. §

523(a)(2)(B). Id. In support on this argument, the creditor claims that, in approving the initial

-15-

loan and one extension, it reasonably relied on a single financial statement providing that the debtor owned two separate real properties free and clear. Id. At the time those loans were approved, the financial statement was six-months old, and one-and-a-half-years old, respectively. Id. The creditor appeared to simply take the financial statement at face value. See id. In its holdings, the court stated that there was no evidence that the creditor did anything to verify the accuracy of the information and could not merely rely on the debtor's personal integrity, the creditor "needed to adopt a more circumspect and prudent approach to lending, and [the creditor] cannot close its eyes to what is obvious" and fail to act prudently. Id. Therefore, the court held that the creditor's reliance was not reasonable under 11 U.S.C. § 523(a)(2)(B). Id.

Also, in O'Donnell v. Floyd  (In re Floyd), the debtor obtained a loan and concurrently provided the creditor with a financial statement that listed property he did not own, inflated the value of property he did own, and understated his liabilities. 177 B.R. 985, 990 (Bankr. M.D. Fla. 1995). The facts before the court showed that the creation of the financial statement was close in time to the loan application and that the creditor and debtor had prior dealings; however, the creditor failed to perform even a minimal inquiry into the accuracy of the information before granting the loan. Id.  The court held that, the creditor's failure to inquire into the accuracy of the financial statement, prevented him from establishing reasonable reliance pursuant to § 523(a)(2)(B) and, as a result, his claim under that section failed. Id.

Another case presenting facts similar to the case at hand—in regards to the incomplete financial statement—is Liberty National Bank v. Wing (In re Wing), 96 B.R. 369 (Bankr. M.D. Fla. 1989).  In Wing, the court considered whether a creditor's reliance on a substantially

-16-

incomplete financial statement was reasonable. Id. The debtor, who sat on the board of the creditor bank, obtained a $150,000 line of credit after providing two current financial statements, both of which contained material falsehoods and lacked a substantial amount of information. Id. at 370–71. Specifically, the debtor failed to complete entire sections of the financial statements. Id. Subsequently, the debtor defaulted on the line of credit, filed bankruptcy, and the creditor moved to have the debt excepted from discharge under § 523(a)(2)(B). Id. at 372. The court held that evidence suggested the creditor did not rely totally or partially on the financial statements, but, even if creditor had, any such reliance would have been unreasonable because the financial statements where substantially incomplete—there were numerous blanks and unanswered questions—and the values of the debtor's real estate holdings were vastly inflated. Id. at 373. The court stated that, given the red flags, the creditor "could have, and should have, required verification of these figures" before making the loan. Id.

The case of Karve Family Limited Partnership v. Mowji (In re Mowji), involved a married couple ("creditors") who invested a significant amount of money—$270,000—in debtor's motel operation. 224 B.R. 221, 223 (Bankr. M.D. Fla. 1998). Prior to investing, the creditors obtained a five-month old financial statement from the debtor and his wife, which grossly overstated the value of their assets as $3,055,500 and net worth as $1,695,500. Id. at 223–24. The creditors only inspected one of the multiple properties listed under assets and failed to confirm the debtor's ownership interest in the assets listed. Id. at 224. The motel operation ultimately failed and the creditors sought to have the debt excepted from discharge under § 523(a)(2)(B). Id. at 224–25. Although the loan was relatively small in comparison to the assets, the Court held that reliance was unreasonable. Id. 226–27. Specifically, the court held that

reliance on a stale five-month old financial statement was unreasonable because the creditor failed to request more financial documentation to substantiate the claims made on the financial statement and should have performed some minimal investigation beyond inspecting one of many properties. Id.

In North Alabama Bank v. Brooks (In re Brooks), the court considered whether a joint financial statement that lacked specificity and detail indicating the debtor's percentage interest in assets listed negated reasonable reliance as a matter of law. 457 B.R. 840 (Bankr. N.D. Ala. 2011). In the case, the debtor obtained and personally guaranteed a $1.5 million line of credit and subsequently renewed the loan numerous times. Id. at 842. The initial loan and each subsequent renewal was accompanied by a financial statement and tax return. Id. The final renewal was accompanied by a joint financial statement of the debtor and his wife; however, only the debtor guaranteed the loan. Id. The debtor significantly overvalued real property on the financial statement and reported that the property was owned free and clear of liens when it was in fact encumbered by a sizable line of credit. Id. Nowhere on the joint financial statement did the debtor state his ownership interest in the listed property. Id. The loan officer stated that he relied heavily on the longstanding, successful relationship between the debtor and creditor in granting the renewal. Id. Looking to the factors established by the Eleventh Circuit in Vann, the court held that, although a "close call" because the financial statement lacked specificity and detail indicating the debtor's percentage interest in assets listed, the creditor's reliance was reasonable because of the longstanding, successful relationship between the debtor and creditor. Id. at 843–45 (citing City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995).

-18-

Also, courts frequently consider the staleness of financial statements as a critical factor in assessing a creditor's reliance pursuant to § 523(a)(2)(B). Most courts in the Eleventh Circuit find that a creditor has not reasonably relied on a financial statement when it is three months or older because the information is considered stale. Whereas, one court held that reliance on a two-month old statement is reasonable. For example, in Enterprise National Bank of Atlanta v. Jones (In re Jones), the creditor relied on a facially inaccurate eleven-month old financial statement in granting a loan to a new customer. 197 B.R. 949, 962 (Bankr. M.D. Ga. 1996). The financial statement provided by the debtor contained a number of red flags, including figures on the front page not matching those on the attachments. Id. The creditor claimed that it did not seek appraisals of the property listed on the statement because it was not accepted as collateral; however, the court noted that this is inconsistent with the creditor's position that it relied on the contents of the financial statement in extending the loan. Id. In its holding, the court stated that the creditor's reliance was not reasonable because it failed to exercise prudence and investigate the accuracy of the stale information. Id.

In First Sanlando Bank v. Benore, (In re Benore), the debtor obtained one loan in the amount of $6,272.28 and, two months later, obtained a second loan for $24,833.89. 108 B.R. 797 (Bankr. M.D. Fla. 1989). Before executing each promissory note, the debtor provided a materially false joint financial statement to the creditor. Id. At the time the loans were approved, the financial statements were four-months old, and six-months old, respectively. Id. The statements were also "incomplete in that the portion dealing with expenses was totally blank." Id. at 798. No action was taken by the creditor "to verify the incomplete [and stale] financial statement." Id. at 799. The court held that the debt was not excepted from discharge and the

-19-

creditor's reliance was unreasonable because the creditor relied on an incomplete, stale financial statement and failed to inquire into the accuracy of the information.

In Agribank, FCB v. Gordon (In re Gordon), the court assessed the reasonableness of a creditor's reliance on a farming debtor's loan application. 277 B.R. 805, 811 (Bankr. M.D. Ga. 2001). Over a few months, the debtor applied for two separate loans and significantly overstated her income and assets on both applications. Id. at 808–09. The debtor and creditor had no financial history together. Id. After a three-stage approval process, which includes an independent credit bureau assessment, both loans where approved. Id. However, but for the false financial information on the application, the loans would have been denied after completion of the approval process. Id. The court held that the creditor's reliance as to the financial information on the first application was reasonable, in part, because the creditor "used an outside source to evaluate Debtor's credit worthiness," followed established lending procedures, the financial information was not stale, and the application did not contain any red flags. Id. at 811. Although the same lending procedures were followed, the court reached the opposite conclusion as to the second application because red flags were present. Id. The court listed numerous red flags, including the amount of liabilities on the second application differing from the first, the presence of inaccurate information, and the absence of the first loan being listed on the second application liabilities section. Id. The court's decision ultimately hinged on the fact that the financial information on the second application was three-and-a-half-months old. Id. Therefore, the Court held that "a reasonable creditor would not have relied on such stale financial data." Id.

-20-

Similarly, in <u>First American Bank of Indian River County v. Schraw (In re Schraw)</u>, the court also considered the proximity in time of a loan application and the creation of the financial statement in determining whether reliance was reasonable. 136 B.R. 301, 303 (Bankr. S.D. Fla. 1992). The case involved a debtor who, over an extended period of time, obtained several loans from the creditor. <u>Id.</u> Each loan application was accompanied by a financial statement. <u>Id.</u> In total, three financial statements were submitted and all contained inaccuracies pertaining to the debtor's ownership of real property. <u>Id.</u> However, the court held that the creditor reasonably relied on the financial statement, which was only two-months old at the time the loan was granted, because it was created within reasonable proximity to time of the application. <u>Id.</u>

The Court sees many similarities between the cases cited and the case at hand. The financial statement provided by Strength was substantially incomplete. Strength stated on the statement that he owned $1,000,000 worth of unencumbered real estate but no description was provided for the property. $1,000,000 worth of real estate is a suspiciously round number, which remained unchanged and unaffected 12-months after one of this Country's worst economic recessions. Strength listed two separate items on the liabilities section—a mortgage and a note—but the monthly expense section did not provide for a payment on either. In fact, the Bank failed to obtain any of Strength's monthly expenses, a figure that would greatly affect Strength's ability to repay the loan. Strength's financial statement suggests that he has zero monthly expenses, a number this Court has trouble believing. Between 2008 and 2009, Strength's bank account balance did not vary by so much as a penny, a fact that seems hard to stomach, even with the presently low interest rates. Strength's annual income in the $20,000 to $30,000 range is

-21-

grossly incongruent with real estate holdings of $1,000,000. Furthermore, no evidence was presented to establish that Strength and the Bank had a long standing history, much less a successful one. Finally, at the time the promissory note was singed, the financial statements were one-year-and-four-months old, and four-months old. A reasonable creditor would not rely on such stale information without further inquiry. Considering the facts in the totality, the Bank's reliance on Strength's financial statements is not reasonable pursuant to § 523(a)(2)(B).

### C. The Bank's Argument that It Observed Its Own Practices and that the Court should not Second Guess its Decision is Without Merit

The Bank argues that it has observed industry customs and practices and that the Court should not second-guess its decision. (Doc. 25, pp. 9–10). The Court declines the Bank's demand for such sweeping deference. Congress specifically provided for a higher standard in § 523(a)(2)(B) cases, such as this, requiring lenders to prove "reasonable reliance" rather than the lower justifiable reliance standard called for in fraud cases not involving written financial statements. Were the Court to so defer to the Bank's determination whether its reliance was reasonable, it would not be true to an act of Congress. Where there is a conflict between banking industry practices and an act of Congress, the act of Congress controls.

### III. CONCLUSION

This case provides a textbook example as to why Congress chose to impose a higher standard on lenders who rely on written financial statements. It would be a poor policy to permit banks to solicit financial statements from borrowers, file them away without inspection or serious

-22-

consideration, only to flyspeck them after the borrower defaults, crying fraud as the Bank has done here.  The financial statement relied upon by the Bank here cried out for investigation, yet the Bank made none.  As the Bank's reliance was not reasonable, the debt is not excepted from discharge.

The Bank makes much of the fact that the Debtor did not answer the complaint.  The Federal Rules of Civil Procedure, as adopted in the Federal Rules of Bankruptcy Procedure, allow the Court discretion to investigate whether a complaint is well founded. This one is not. The Bank has been given two evidentiary hearings and has filed a brief.  Its evidence and brief, and the argument made by its counsel at both the original hearing and the hearing on the motion to alter and amend, have all been carefully considered by the Court.   The Court will deny the Bank's motion by way of a separate order.

Done this 20th  day of December, 2016.

United States Bankruptcy Judge

c: Burton W. Newsome, Attorney for Plaintiff
   Freddie Lewis Strength, Defendant

-23-