IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| USAMERIBANK, f/k/a ALIANT BANK, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | CASE NO.  2:16-CV-995-WKW |
| | ) | [WO] |
| FREDDIE LEWIS STRENGTH, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant-Appellee Freddie Lewis Strength received a loan from Plaintiff-Appellant USAmeriBank.  Turns out, the financial statements Mr. Strength used to obtain the loan contained false information—Mr. Strength never owned the $1 million in real estate he listed as his.  Mr. Strength defaulted and filed for Chapter 7 bankruptcy.  This case is about whether, in the procedural context of a motion for default judgment, the debt can be declared non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) or (B) because it was based on fraud.   Applying a preponderance of the evidence standard in a default judgment proceeding, the bankruptcy court said no, because the bank's reliance on Mr. Strength's financial statements was unreasonable.  *See USAmeribank v. Strength (In re Strength)*, 562

B.R. 799, 812 (Bankr. M.D. Ala. 2016); (Doc. # 7-14, at 23); (Doc. # 7-8, at 4).  The

bank appeals.  The decision of the bankruptcy court is due to be reversed.

## I.  JURISDICTION AND VENUE

The bankruptcy court had jurisdiction of the adversary proceeding pursuant to

28   U.S.C. §§   157(a)   and   1334(b).     It  is  a  core   proceeding   under   28

U.S.C. § 157(b)(2)(I).  This court exercises jurisdiction to hear the appeal under 28

U.S.C. § 158(a)(1).  Venue is proper under 28 U.S.C. § 158(a).

## II.  BACKGROUND

### A.    The Promissory Note and Financial Statements

On September 18, 2009, Mr. Strength signed a commercial promissory note

in favor of USAmeriBank[1] for $24,416.00 in return for an unsecured loan.  (Doc. #

7-3, at 3–4.)  Mr. Strength was to repay the loan at an 8.5% interest rate over the

next five years.

Mr. Strength submitted two financial statements to the bank.  (Doc. # 7-3, at

5–8.)  Because these statements form the basis of this dispute, they will be described

in detail.

---

[1]  The Plaintiff was then known as Aliant Bank.  For clarity, the bank's past iteration will still be referred to as USAmeriBank or "the bank."

**1.** *May 21, 2008 Financial Statement*

The first financial statement was dated May 21, 2008. (Doc. # 7-3, at 5–6.) Beneath the date, the form listed a "HELPFUL HINT: The easiest way to fill out this form is to fill out page 2 with schedules first & then bring totals over to page 1 & fill in the rest of the information requested." Below the hint were five general categories of information sought: "Individual," "Assets," "Liabilities and Net Worth," "Contingent Liabilities," and "Sources of Income."

Under "Individual," Mr. Strength listed his name, personal information, and employment as a realtor for ALFA Realty Company.

Under "Assets," Mr. Strength listed $2,898.77 in cash on hand at the bank; $1,000,000.00 in real estate; $14,500.00 in automobiles; $25,000.00 in cash value life insurance; and $129,000.00 in bonds for titles. This comes to a total of $1,171,398.77.

The form's notation for the real estate line said "See Schedule C (*on 2nd page*)." This referred to a box on the second page of the document that provided blanks for the description of the property, cost, market value, and mortgage information. Mr. Strength left Schedule C blank. Likewise, the form's notation for cash value life insurance referenced Schedule D, which provided blanks for the life insurance company, the value of the policy, collateral, and the beneficiary. Mr. Strength also left Schedule D blank.

Under "Liabilities and Net Worth," Mr. Strength listed real estate mortgages totaling $49,960.00. That line also referenced Schedule C, which, as noted, was left blank. Mr. Strength also left blank the box for total net worth. Had he filled it in, Mr. Strength's total net worth, as calculated from his listed assets minus his listed liabilities, would have been $1,121,438.77.

The next section, "Contingent Liabilities," was also left blank.

The final box was split into two categories: "sources of income" on the left and "monthly expenses" on the right. Under income, Mr. Strength listed a salary of $6,591.00 and "Other (alimony, child support, SS, etc.)" in the amount of $9,438.00. Mr. Strength left the monthly expenses category (mortgage, rent, insurance, car payments, installment notes, alimony/child support) blank.

Page two of the form contained a list of schedules in which an applicant could list the details of the general categories requested on page one. Mr. Strength did not do this; he left Schedules A–E blank. Below the schedules was a "General Information" section in which Mr. Strength indicated that he was not a partner in a firm, had never been a defendant in a lawsuit, and had never filed for bankruptcy. Below that was the fine print, by which Mr. Strength agreed that the financial statement constituted a "continuing statement . . . until replaced by a new statement," and that the bank could investigate his credit and employment history.

**2.** *May 22, 2009 Financial Statement*

The second financial statement was from a year and a day later: May 22, 2009. (Doc. # 7-3, at 7–8.)  The form remained the same, as did much of the information Mr. Strength provided.  Mr. Strength's "Business/Employer" changed to "ALFA Realty-Retired"; his cash on hand at the bank remained exactly $2,898.77; his real state remained valued at $1,000,000, his automobiles at $14,500, his life insurance at $25,000.

Some information was updated.  Gone was the $129,000 in bonds for titles. And unlike in the earlier statement, Mr. Strength provided corresponding information in the schedules for his bank account assets, life insurance, and mortgages.  He still left Schedule C—"Real Estate Owned"—blank.  Mr. Strength also updated the "Liabilities and Net Worth" section with an additional $23,714.23 loan from the bank.  This brought his total listed liabilities to $73,674.24, and his total net worth to $968.724.53.

Finally, in the "Sources of Income" section, Mr. Strength's listed salary increased to $12,755.00.  There also was a new category of "Rental Income" of $13,400.00 that took the place of the previous statement's catchall of "Other" and its listing of $9,438.00.

B.     **Procedural History**

Mr. Strength filed for Chapter 7 bankruptcy on January 22, 2016.  (Doc. # 7-3, at 1.)  According to the bank, Mr. Strength admitted at the meeting of his creditors that he never owned the $1 million in real estate he listed on the financial statements. The bank instituted this adversary proceeding on March 22, 2016, seeking to have the debt excepted from the bankruptcy discharge under 11 U.S.C. § 523(a)(2)(A) and (B).  (Doc. # 7-3.)  After Mr. Strength failed to defend, the bank moved for an entry of default and default judgment under Federal Rule of Bankruptcy Procedure 7055, which incorporates Federal Rule of Civil Procedure 55.  (Doc. # 7-4.)  The clerk entered default (Doc. # 7-5), and the bankruptcy court set an evidentiary hearing on the motion for default judgment (Docs. # 7-6, 7-7).

1. *The First Evidentiary Hearing*

At the first evidentiary hearing, the bank sought a default judgment of $43,563.22.[2]  (Doc. # 7-11, at 7–8.)  It presented one witness: Cynthia Joiner, the bank's vice president of collections and special assets.  Ms. Joiner testified that the bank relied on Mr. Strength's two financial statements in determining whether to issue him the loan.  She said the bank only learned that Mr. Strength never owned

---

[2] This total includes $27,437.17 from the loan and accrued interest, $5,907.62 in collection fees, and $10,217.50 in legal fees.  (Doc. # 7-11, at 7–8.)  The number differs from the amount sought by the bank in its Complaint (Doc. # 7-3) and in its motion for entry of default judgment and the accompanying affidavit (Doc. # 7-4). In those documents, the bank sought $26,709.11 (which included $6,627.07 in legal fees), plus costs.  (Doc. # 7-4, at 2.)

6

the $1 million in real estate after he defaulted on the loan and filed for bankruptcy.

(Doc. # 7-11, at 5–6.)

The Bankruptcy Judge asked Ms. Joiner about whether the bank's reliance on

Mr. Strength's financial statements alone was reasonable:

> [The Court]: [The financial statement] says a million dollars in real estate?
>
> [Ms. Joiner]: Yes.
>
> [The Court]: And then you look to Schedule C on the next page and I don't see any detail there.  Was any followup done on that?
>
> [Ms. Joiner]: Unfortunately, it's very common that customers do not completely fill out the form and when we are making a loan, unless we have an issue that we've had a problem in the past with collection or other issues, we normally take him at his face value when he certifies that it is correct.
>
> [The Court]:  Okay.  So nobody—so at the time you got the financial statement or at the time you made the loan[,] nobody said what's this million dollars you got for land, what is it or where is it?
>
> [Ms. Joiner]: They would not.  But, we also had tax returns that would have shown whether he had income or not from the sale of those, that he was a real [estate] agent at the time, and sometimes brokers will own property, sell property, own property, sell property.  So we would have had his tax return to look at his income and we would have used the financial statement to verify that he had assets to back up his repayment of our loan.

(Doc. # 7-11, at 9–10.)

7

### 2. *The First Memorandum Decision*

On August 8, 2016, the bankruptcy court denied the bank's motion for default judgment and instead entered judgment for Mr. Strength. *See USAmeriBank v. Strength (In re Strength)*, Adv. Pro. No. 16-3022-WRS, 2016 WL 4204084 (Bankr. M.D. Ala. Aug. 8, 2016); (Docs. # 7-8, 7-9.)   The court found that 11 U.S.C. § 523(a)(2)(A) did not apply because Mr. Strength's false representation was "a statement respecting the debtor's . . . financial condition," which was precisely what § 523(a)(2)(A) excluded.  (Doc. # 7-8, at 3.)

Turning to 11 U.S.C. § 523 (a)(2)(B), the bankruptcy court acknowledged that the bank met three of the four elements: Mr. Strength's written financial statement (1) was materially false, (2) concerned his financial condition, and (3) was made with the intent to deceive the bank.  But, the court concluded, the bank had not proved the fourth element by a preponderance of the evidence: that it reasonably relied on Mr. Strength's financial statements.

The bankruptcy court listed a number of reasons for its conclusion.  First, it pointed to the blank Schedule C on the financial statements as warranting suspicion. Though recognizing that Ms. Joiner testified that applicants often leave parts of the statements blank and that it is the bank's usual practice to accept the statements at face value, the court found that the bank's "[s]tandardization of the practice does not make it reasonable."  (Doc. # 7-8, at 5.)  Second, the bankruptcy court found that

"none of the other information [Mr.] Strength listed in his statements is congruent with ownership of $1 million in unencumbered real estate." (Doc. #7-8, at 5.) And third, the bankruptcy court noted that there was minimal evidence of prior dealings between the bank and Mr. Strange that would establish a level of trust that might excuse the bank from verifying the information on the financial statements. "Looking at the totality of the circumstances," the court concluded, "an ordinary person would not have made an unsecured loan of this size on the borrower's bare assertion that he owned $1 million in unencumbered real estate." (Doc. # 7-8, at 5.)

### 3.  *The Second Evidentiary Hearing*

The bank moved to alter, amend, or vacate the bankruptcy court's judgment (Doc. # 7-12), and the bankruptcy court scheduled another hearing (Doc. # 7-13).

At the second hearing, the bank sought to show, contra the court's findings, that there was nothing in Mr. Strength's financial statements that would have been considered a red flag at the time the bank issued the loan. James May, a retired credit administration specialist and former in-house legal counsel, testified that he had reviewed "thousands" of financial statements during his 32 years of banking experience, and that there was nothing of concern in Mr. Strength's statements. (Doc. # 7-18, at 8.)

> [The bank]: And in reviewing those financial statements, did you notice anything that was like a red flag or that would cause you to want to do further inquiry into the veracity of anything?

[Mr. May]: No, the—particularly the '09, May the 22nd of '09 financial statement was properly filled out. It balanced. It gave his income, and there's insurance and other information. And it's perfectly clear about what[] [he's] claiming his assets are and liabilities of course and net worth.

[The bank]: And he signed certifying both of those financial statements as true and correct to the bank, does he not?

[Mr. May]: That's right, yes.

[The bank]: And based on your 32 years of experience in banking[,] in connection with a loan this size, would a bank make a loan based on that financial statement alone or would they do further inquiry?

[Mr. May]: I would say they would make a loan based on this financial statement. Of course, I cannot put myself in the place of the loan officer, but this is what I would consider a good strong financial statement, particularly for a $24,000 loan.

(Doc. # 7-18, at 9–10.)

The Bankruptcy Judge questioned Mr. May about the reasonableness of relying on Mr. Strength's incomplete financial statements, especially considering that the bulk of Mr. Strength's assets was tied to real estate for which he provided no additional information. (Doc. # 7-18, at 14–15.) Mr. May responded:

[Mr. May]: Your Honor, it may be one thing worth mentioning as far as the practicality of what we're talking about here –

[The Court]: Okay.

[Mr. May]: —and that is that there's a lot of applications filed with banks for loans, as you can quite imagine, and if you did the due diligence, as I think that you're thinking about here, for every application that you take, it would make it economically—it would have a negative economic [e]ffect on the whole operation of the lending

10

department there because it takes time, effort and money to do that due
diligence, the title searches that require—if there's a question about the
value, appraisals or opinions or whatever you might chose to seek.

So banks in general just don't do that.  I mean there's—it's quite
common for loans to be made solely on the financial statement and
that's all this bank had at this point it seems to me was this financial
statement, which was very—which had all the appearances of being a
quality statement, a good strong assets and income . . . .

(Doc. # 7-18, at 16–17.)

Mr. May also testified that he thought the numbers listed in the "Sources of

Income" section of the financial statements referred to monthly income since it was

adjacent to the box for  "Monthly Expenses."  (Doc. # 7-18, at 20–21.)  The

Bankruptcy Judge said that he assumed the income referred to annual income, but

acknowledged that he did not "see anything [on the form] that indicates on the

income side whether that's annual or monthly."  (Doc. # 7-18, at 21.)

At the conclusion of the hearing, the discussion returned to the whether the

bank acted reasonably:

[The bank]: . . . I just ask you to take into consideration the size of the
loan.  If they were loaning him $200,000, then—and they didn't—you
know, and they—or a half a million dollars and they didn't do that,
that's one thing, but for $24,000, an Alfa commercial real estate
broker[] testifies he owns property unencumbered, swears to it on his
financial statement, I mean I think it's reasonable to rely on that.  Even
if he's puffing, if he just has $50,000 in unencumbered property, I can
attach it, liquidate and pay off our loan.

You know, it's unreasonable to—I mean I would note after 29 years I
would never assume somebody was just lying to that degree.  That's
absurd.

11

[The Court]: I guess, you know, maybe I get jaundiced from the jobs that I've had, yes, that, you know—and before I had the job I have now, you know, I worked criminal prosecutions and on bankruptcy fraud, so it does not shock me at all that people lie on financial statements. They lie on tax returns. They lie on schedules they filed in bankruptcy court.

Yes, I guess the one point, you know, that you have given me to think, Mr. Newsome, is the size of the loan. If it was a million dollar loan, you know, maybe you'd take a harder look at the assets. If it was a half million dollar loan, maybe a little less, but still, but a $24,000 loan, yes, I see your point there, that the smaller the loan, the less the bank would be—would expect to do and due diligence. . . .

(Doc. # 7-18, at 23–24.)

### 4. *The Second Memorandum Decision*

On February 14, 2017, the bankruptcy court denied the bank's motion to alter or amend the prior judgment. (Doc. # 7-14, at 1.)

The bankruptcy court first identified five "red flags" it concluded would have prompted a reasonable person to investigate further before loaning Mr. Strength money:

First, the amount of $1,000,000 stands out—dramatically—from the rest of the information on the financial statements. Not to put too fine a point on this, $1,000,000 is a great deal of money. Second, real estate holdings of $1,000,000 are grossly incongruent with [Mr.] Strength's level of income, which the Bank knew to be in the $20,000 to $30,000 range annually. Third, the real estate was not subject to a mortgage—highly unusual in a case such as this. Fourth, the financial statement calls for details on real estate, yet none was provided. Fifth, $1,000,000 is a suspiciously round figure.

(Doc. # 7-14, at 3.)  Given these red flags, the bankruptcy court determined that it was unreasonable for the bank to rely solely on Mr. Strength's financial statements. (Doc. # 7-14, at 6–7.)  As for the bank's witnesses who thought differently, the court found that, "[w]hile both [Ms.] Joiner and [Mr.] May have training and experience in reading financial statements, they are both biased witnesses.  The Court also has experience in reading financial statements."  (Doc. # 7-14, at 6.)

The bankruptcy court concluded that the bank's reliance on the financial statements was not reasonable, even if the bank's actions were consistent with industry customs.  Therefore, it found it to be within its discretion to deny the motion to alter or amend the judgment, and this it did.  (Doc. # 7-14, at 13–22.)  The bank appeals.

### III.  STANDARD OF REVIEW

The denial of a motion for default judgment is reviewed for an abuse of discretion. *Sanderford v. Prudential Ins. Co. of Am.*, 902 F.2d 897, 898 (11th Cir. 1990).  A court has abused its discretion if it "applied an incorrect legal standard, applied the law in an unreasonable or incorrect manner, followed improper procedures in making a determination, or made findings of fact that are clearly erroneous." *Kolawole v. Sellers*, 863 F.3d 1361, 1366 (11th Cir. 2017).

# IV.  DISCUSSION

On appeal, the bank advances eight ways the bankruptcy court erred.  (Doc. # 14, at 16–17.)   Generally speaking, the first relates to the bankruptcy court's application of the preponderance of the evidence standard in a default judgment proceeding, the second to the procedural propriety of entering judgment for Mr. Strength while he was still in default, and the last six to the bankruptcy court's application of 11 U.S.C. § 523(a)(2)(B) and the specific factual findings the court made in determining that the bank's reliance was unreasonable.

## A.   <u>Default and Default Judgment</u>

Federal Rule of Bankruptcy Procedure 7055 provides that Rule 55 of the Federal Rules of Civil Procedure applies in adversary bankruptcy proceedings.  Rule 55, in turn, creates a two-step process for motions for default and default judgment. First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  It is undisputed that this step occurred and that the clerk entered Mr. Strength's default. (Doc. # 7-5.)

The second step concerns the entering of the default judgment.  If the plaintiff's claim is for a sum certain and is against a defendant who defaulted because he or she did not appear, then the clerk "must" enter default judgment so long as the

14

defendant is not a minor, an incompetent person, or the Government.  Fed. R. Civ.

P. 55(b)(1), (d).  Though the rule appears—and generally is—mandatory, a court

retains its inherent authority to dismiss frivolous actions *sua sponte*.  *See Surtain v.*

*Hamlin Terrace Found.*, 789 F.3d 1239, 1248 (11th Cir. 2015).

    "In all other cases, the party must apply to the court for a default judgment."

Fed. R. Civ. P. 55(b)(2).  Once a party applies for a default judgment, "[t]he court

may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it

needs to: (A) conduct an accounting; (B) determine the amount of damages; (C)

establish the truth of any allegation by evidence; or (D) investigate any other matter."

*Id.*  Accordingly, simply because a defendant is in default under Rule 55(a) does not

mean the plaintiff is automatically entitled to a default judgment under Rule 55(b).

*See generally* 10A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane,

*Federal Practice & Procedure* § 2685 (4th ed. 2016).  Rather, the court still has a

duty to ensure that there is a "sufficient basis in the pleadings for the judgment

entered."  *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th

Cir. 1975).[3]

    The Eleventh Circuit has interpreted this standard "as being akin to that

necessary to survive a motion to dismiss for failure to state a claim."  *Surtain*, 789

---

[3]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the
Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior
to October 1, 1981.

F.3d at 1245.  Thus, just as in evaluating a motion to dismiss, a court presented with a motion for default judgment "looks to see whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In other words, "[a]lthough a defaulted defendant is deemed to have admitted the movant's well-pleaded allegations of fact, she is not charged with having admitted 'facts that are not well-pleaded or . . . conclusions of law.'"  *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1339–40 (11th Cir. 2014) (quoting *Cotton v. Mass. Mut. Life. Ins. Co.*, 402 F.3d 1267, 1278 (11th Cir. 2005)).

Strictly speaking, however, a motion for default judgment is not *simply* "like a reverse motion to dismiss for failure to state a claim."  *Surtain*, 789 F.3d at 1245. For one, whereas a ruling on a motion to dismiss is reviewed *de novo*, a trial court's ruling on a motion for default judgment is reviewed for an abuse of discretion. *Sanderford*, 902 F.2d at 898.  For another, a court facing a motion for default judgment can hold an evidentiary hearing to consider matters outside the pleading(s). Fed. R. Civ. P. 55(b)(2)(D).  And whereas Federal Rule of Civil Procedure 12(d) instructs a court to treat a Rule 12(b)(6) motion as one for summary judgment if "matters outside the pleadings are presented to and not excluded by the court," Rule 55 does not.  Hence, an evidentiary hearing to determine liability under Rule 55(b)(2)

does not change the default judgment standard to anything more demanding than plausibility.

Importantly, this standard for determining liability differs somewhat from the standard for determining damages in a default judgment proceeding. This is because, whereas a defaulting defendant is deemed to have admitted all well-pleaded facts as true, the amount of damages resulting from those facts might still be subject to dispute. *See generally Wright*, *supra*, § 2688.1. Of course, sometimes the two are so tied together that there is no need for a separate hearing or damages determination. *E.g.*, *Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015) ("The plaintiffs, in their complaint, alleged that [the defendant] wrongfully retained the $34,000 that they had wired to him. By his default, [the defendant] admitted that allegation. Given those simple facts, the court required no additional evidence to determine the amount of damages."). At other times, the amount of damages is very much in dispute, even though the underlying factual allegations are not. *E.g.*, *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003) (upholding use of Rule 55(b)(2) evidentiary hearing in defamation case because "[d]amages resulting from defamation, unlike liquidated damages, may range from nominal to significant amounts"). But at all times, the court has an obligation to make a "fully informed determination of damages." *SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005).

In this way, an uncontested default judgment hearing on plausibility might be thought of as a free throw shot in basketball—the net is unguarded, but the shooter still has to get the ball in the hoop (*i.e.*, the facts must still be plausible).   The damages hearing, however, might be more akin to soccer's penalty kick: there is a goalie (judge) ensuring the plaintiff can prove damages.[4]

Applying these rules here, it is evident that the bankruptcy court abused its discretion when it applied a preponderance of the evidence standard to a default judgment proceeding.  In its first memorandum opinion, the court explained that "[a] creditor seeking to hold a debt non-dischargeable has the burden of proving each element by a preponderance of the evidence."  (Doc. # 7-8, at 4 (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).)   But while that is the correct *evidentiary* standard for a trial, it is not the correct *pleading* requirement.  The Eleventh Circuit explained the difference when it vacated a district court's denial of default judgment in *Surtain*.  *See* 789 F.3d at 1246.  There, the district court found that the plaintiff failed to plead a valid claim for relief in a Title VII race discrimination action because she had not made out a *prima facie* case under *McDonnell Douglas*.  *Id.* The Eleventh Circuit held that this was error "because *McDonnell Douglas*'s burden-shifting framework is an evidentiary standard, not a pleading requirement."

---

[4]  If the hearing is contested, perhaps it becomes more like a free kick, where both the players and the goalie defend the goal.

*Id.* (citation omitted).  "Accordingly, a court may properly enter default judgment on a claim of racial discrimination when the well-pleaded factual allegations of a complaint *plausibly suggest* that the plaintiff suffered an adverse employment action due to intentional racial discrimination."  *Id.* (emphasis added).

The bankruptcy court distinguished *Surtain* based on "the procedural difference between *Surtain* and the case at bar"—namely, that in *Surtain* there was no evidentiary hearing and here there was.  (Doc. # 7-14, at 12.)  Thus, if the *Surtain* standard were applied across the board, "a trial court could never look behind the pleadings to the underlying facts of the case," even though Rule 55(b)(2)(C) establishes that a court can do just that.  (Doc. # 7-14, at 12.)

But simply because a trial court can hold an evidentiary hearing does not mean that the applicable standard changes in that hearing.  Indeed, it would be odd if this were the case, for it would mean that a court could find that a plaintiff's complaint and motion for default judgment satisfy the *Twombly*/*Iqbal* standard such that default judgment should ordinarily be granted, but then choose to hold an evidentiary hearing and find that the evidence does not support a finding of liability under the heightened standard of proof that would be applicable at trial.

To be sure, there are some settings in which the standard does change based on whether an evidentiary hearing is held.  *See, e.g.*, *Chalwest (Holdings) Ltd. v. Ellis*, 924 F.2d 1011, 1013–14 (11th Cir. 1991) (explaining that, if a district court

does not conduct an evidentiary hearing on a jurisdictional motion to dismiss, the standard the plaintiff must meet is plausibility, but if the court holds a pretrial evidentiary hearing to ultimately resolve the issue, the standard is preponderance of the evidence).  But this recognition supports nothing more than the unremarkable proposition that the burden of proof is higher to win judgment at trial than it is to survive a motion to dismiss.  (In the *Chalwest* example, the plaintiff who escaped a motion to dismiss by proving a *prima facie* case of jurisdiction would ultimately have to meet the preponderance standard at trial.)   Yet the bankruptcy court's construction would cast Rule 55 as providing the exact opposite, somehow making it easier to succeed in getting a *judgment* on the pleadings than if evidence were taken.  This is not what the Eleventh Circuit had in mind when it characterized a motion for default judgment as a "reverse motion to dismiss for failure to state a claim."  *Surtain*, 789 F.3d at 1245.

Nor would this interpretation read out of Rule 55 the trial court's ability to conduct a hearing, as the bankruptcy court feared it would.  First, the Eleventh Circuit has instructed that these evidentiary hearings are most helpful, and nearly required, when the amount of damages is disputed or unknown.  *See Smyth*, 420 F.3d at 1232 n.13.  As explained above, this is because, unlike with well-pleaded facts that establish liability, the amount of damages asserted in the complaint will not simply be taken as true.  Second, it is possible, though still technically unresolved,

that "otherwise fatal defects in the pleadings might be corrected by proof taken by the court at a hearing." *Nishimatsu Constr. Co.*, 515 F.2d at 1205 n.5.  And third, evidence can still be taken to "establish the truth of any allegation" or "investigate any other matter" that perhaps was not detailed at length in the complaint.  Fed. R. Civ. P. 55(b)(2)(C), (D).

On this third point, the Fifth Circuit has approved the use of evidentiary hearings to "prove-up" or "flesh out" minimal factual allegations from the pleadings. *See Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 499–500 (5th Cir. 2015).  In *Wooten*, the court first noted that the plaintiff's complaint satisfied the low threshold of Rule 8's pleading requirements.  *Id.* at 500.  Then it concluded that, because the plaintiff's testimony at the prove-up hearing "added factual details that fleshed out his claim," the hearing served a permissible purpose under Rule 55(b)(2). *Id.*  Thus, "[c]onsidering this evidence *in addition to the allegations* in [the plaintiff's] complaint," the court found "ample grounds for the entry of default judgment."  *Id.* (emphasis added).[5]

---

[5]  Two differences between *Wooten* and the instant case are worth acknowledging.  First, in *Wooten*, the question before the court was whether the trial court abused its discretion in entering default judgment, whereas here the issue is whether the bankruptcy court abused its discretion in *not* entering default judgment.  Second, the *Wooten* court "decline[d] to import Rule 12 standards into the default-judgment context," as the Eleventh Circuit has done, because a defendant "ordinarily must invoke Rule 12 in order to avail itself of that rule's protections."  788 F.3d at 498 n.3.  Still, the *Twombly/Iqbal* pleading requirements remain the same, *see id.* at 498 (citing *Bell Atl. Corp. v. Twombly*, 500 U.S. 544, 555 (2007)), and to the extent the Eleventh Circuit has applied a higher standard, this would seem to assuage the bankruptcy court's concerns even further.

21

So too here.  The bank's Complaint included specific factual allegations about the loan it made to Mr. Strength, the false representations Mr. Strength made to get the loan, and the fact that Mr. Strength then defaulted on the loan.  (Doc. # 7-3, at 1–2.)  It also included as exhibits the loan documents and Mr. Strength's financial statements.  (Doc. # 7-3, at 3–8.)  This was more than the "unadorned, the-defendant-unlawfully-harmed-me accusation" the Supreme Court decried in *Ashcroft v. Iqbal*. 556 U.S. 662, 678 (2009).  It contained enough factual content to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

While the bankruptcy court still was free to hold an evidentiary hearing and to consider those additional factual details, plausibility remained the standard the court should have applied—evidentiary hearing or no.  The bankruptcy court abused its discretion by applying a different one.  *See Kolawaole*, 863 F.3d at 1366. [6]

---

[6]  The bank also contends that the bankruptcy court erred by entering judgment for Mr. Strength even though he was in default, citing *Tyco Fire & Security, LLC v. Alcocer* for the proposition that a court would first have to find "good cause" to vacate the entry of default before denying a motion for default judgment.  (Doc. # 14, at 34–35 (citing 218 F. App'x 860, 864 (11th Cir. 2007)).)  While the Eleventh Circuit in *Tyco Fire* did conclude that the district court's granting of the defendant's motion to dismiss based on *forum non conveniens* without first vacating the clerk's default order was "internally inconsistent," this was because a defendant, once in default, cannot raise certain *procedural* defenses—such as *forum non conveniens*.  218 F. App'x at 864. In contrast, the court explained, a defendant, "even though in default, is still entitled to contest the sufficiency of the complaint *and its allegations* to support the judgment being sought."  *Id.* at 863 (emphasis added).

Even more to the point of the bank's allegation of error, the Eleventh Circuit also explained that, "before entering a default judgment for damages, the [trial] court must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a

## B.   <u>Reasonable Reliance Under 11 U.S.C. § 523(a)(2)(B)</u>

Because it is possible that the bankruptcy court's application of the wrong standard was harmless error, it is worth considering in more detail whether the factual allegations of the Complaint, taken together with evidence from the hearings, combine to make the bank's allegations plausibly state a claim for relief under 11 U.S.C. § 523(a)(2)(A) or (B).

The bankruptcy court was correct in concluding that the bank failed to state a claim under 11 U.S.C. § 523(a)(2)(A).   That section excludes "statement[s] respecting the debtor's . . . financial condition"—exactly what Mr. Strength provided.  (Doc. # 7-8, at 3.)  The bank does not seem to challenge this determination on appeal.

Next, 11 U.S.C. § 523(a)(2)(B) provides that an otherwise-dischargeable debt in bankruptcy is not dischargeable if it was obtained by a statement in writing that (1) is false, (2) concerned the debtor's financial condition, (3) "on which the creditor to whom the debtor is liable for such money . . . reasonably relied," and (4) that the debtor made with intent to deceive.  As detailed above, the bankruptcy court found that the bank met all elements save for reasonable reliance—and there it found that

---

substantive cause of action and there is a substantive, sufficient basis in the pleadings for the particular relief sought."  *Id.*  Since this was the inquiry undertaken by the bankruptcy (albeit under the wrong standard), it would not have to find good cause to vacate the entry of default to conclude that entering default judgment would be inappropriate.

the bank did rely on Mr. Strength's financial statements but that its reliance was unreasonable.  (Doc. # 7-8, at 4.)

Reasonable reliance "connotes the use of the standard of [the] ordinary and average person."  *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 280 (11th Cir. 1995).  This is a factual question determined by the totality of the circumstances.  *Collins v. Palm Beach Sav. & Loan (In re Collins)*, 946 F.2d 815, 817 (11th Cir. 1991).  Factors in determining whether conduct is reasonable include:

- whether there had been previous business dealings with the debtor that gave rise to a relationship of trust;

- whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and

- whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Davenport v. Frontier Bank (In re Davenport)*, 508 F. App'x 937, 938 (11th Cir. 2013).  Additionally, courts often consider the creditor's standard practices, as well as the practices of the industry as a whole.  *See* 4 *Collier on Bankruptcy* § 523.08[2][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017); *see also Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1117 (3d Cir. 1995).

Since reasonable reliance is a higher standard than justifiable reliance (which applies to fraud under 11 U.S.C. § 523(a)(2)(A)), understanding the latter can shed light on the former.  *See Field v. Mans*, 516 U.S. 59, 74 (1995).  "Justifiable reliance

24

represents a compromise between the rigid reasonableness standard and the lenient actual reliance standard." *In re Vann*, 67 F.3d at 281.  As the Supreme Court has explained, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case." *Field*, 516 U.S. at 70–71 (quoting Restatement (Second) of Torts § 545A (1976)).  In contrast, reasonableness is the "application of a community standard of conduct to all cases." *Id.* at 71.  Thus, under the justifiable reliance standard, a person who buys a piece of land from a seller who says that the land is free of encumbrances can justifiably rely on that representation, even if "[the buyer] could have walked across the street to the office of the register of deeds in the courthouse and easily have learned of an unsatisfied mortgage." *Id.* at 70 (internal quotation marks, citation, and alteration omitted).  But such reliance, while justifiable, might not be reasonable.

Here, the bankruptcy court found that the bank's reliance on Mr. Strength's financial statements was unreasonable.  As the bankruptcy court put it, "an ordinary person would not have made an unsecured loan of this size [$24,416] on the borrower's bare assertion that he owned $1 million in unencumbered real estate." (Doc. # 7-8, at 5.)  The bankruptcy court explained that an ordinary person would be suspicious of the incomplete information Mr. Strength provided, the blanks he left in Schedule C asking for the details of his real estate assets, the suspicious nature of the $1 million number, and the incongruence between his listed salary and the

amount of real estate he purported to own.  According to the bankruptcy court, a reasonable person would have conducted an independent investigation of the claims made on the financial statements before loaning Mr. Strength the money.  Since the bank did not do this, the bankruptcy court concluded, its reliance was not reasonable. (Doc. # 7-14, at 2–19.)

It is certainly true that these findings might preclude the bank from recovering at trial under a preponderance of the evidence standard.  But that was not the query before the bankruptcy court.  Instead, as explained above, the question for the bankruptcy court was simply whether the bank had shown that it was *plausible* (in the Rule 12(b)(6) meaning) that its reliance was reasonable.  That application changes everything.

For instance, at the first evidentiary hearing, Cynthia Joiner, the vice president of collections and special assets at the bank, testified that the bank typically takes the financial statements at face value, even when incomplete.  (Doc. # 7-11, at 9.) Then, at the second hearing, Mr. May, the former loan officer and in-house counsel, applied the standards of the industry to conclude that Mr. Strength's loan application and financial statements were strong, "particularly for a $24,000 loan."  (Doc. # 7-18, at 10.)  This was in part because, while he had seen plenty of people "inflate the value of their real estate holdings," Mr. May could not recall "anybody completely lying" about such assets—and if the assets were simply inflated, then there likely

would have been enough collateral to attach to make the loan worthwhile.  (Doc. # 7-18, at 10.)   And finally, as the bankruptcy court acknowledged, the evidence showed that there is a sliding scale for how much investigation the reasonable person would undertake contingent on the size of the loan.  To use the *Field* example, while a person might walk across the street to the courthouse to learn of an unsatisfied mortgage, he might not walk across town—or take a train across the state—to do the same.  *Cf.* 516 U.S. at 74.  It would depend on the value of the property and the cost of conducting the due diligence.  Thus, it is plausible to expect less investigation for smaller loans, such as Mr. Strength's.  (Doc. # 7-18, at 23–25.)

Taken all together, it still might be that the bankruptcy court's determination of what the reasonable person would do was correct under the evidentiary standard it applied.   Yet it is nevertheless *plausible*, given the factual allegations in the Complaint and the testimony at the two evidentiary hearings, that the bank's reliance was reasonable.   That is all that is required in an uncontested default judgment hearing.

## V.  CONCLUSION

The bankruptcy court abused its discretion by applying the wrong legal standard to the bank's motion for default judgment.  Because there was evidence that showed the bank's claim under 11 U.S.C. § 523(a)(2)(B) was plausible, the bankruptcy court's judgment for Mr. Strength constituted reversible error.

Accordingly, it is ORDERED that the bankruptcy court's August 8, 2016 judgment is REVERSED and that this action is REMANDED to the bankruptcy court for an entry of default judgment in favor of Appellant USAmeriBank.  The bankruptcy court is free to take additional evidence to determine the amount of damages, in accordance with Rule 55(b)(2)(B).  It should also keep in mind that recovery cannot exceed that which was demanded in the pleadings.  Fed. R. Civ. P. 54(c) ("A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."); *cf. supra* note 2 (highlighting difference between what the bank requested at the evidentiary hearing and what it listed in its Complaint).

DONE this 20th day of October, 2017.

_____
/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE